## BETHLEHEM-SPARROWS POINT SHIPYARD, INC.
### *v.* MARIE SCHERPENISSE

[No. 35, October Term, 1946.]

*Decided December 12, 1946.*

The cause was argued before MARBURY, C. J., DELAPLAINE, COLLINS, GRASON, and HENDERSON, JJ.

*James C. Morton, Jr.,* and *John G. Rouse, Jr.,* for the appellant.

*Paul Berman* and *Sigmund Levin,* with whom were *Bernard E. Stern* and *Theodore B. Berman* on the brief, for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

On January 20, 1945, Cornelius Scherpenisse, age 51, and employee of Bethlehem-Sparrows Point Shipyard, Inc., stepped upon a nail in getting out of a lifeboat at one of the shipyard piers at Sparrows Point, and sustained a large puncture wound in his left foot. He died in the Church Home and Hospital in Baltimore on March 9, 1945. Claim for workmen's compensation was made by Marie Scherpenisse, his widow, on the ground that his death was caused by typhus fever, and that the virus had entered his body through the wound. The State Industrial Accident Commission disallowed the claim, but its decision was reversed in the Superior Court of Baltimore City. From the judgment in that court in favor of the claimant, the employer has appealed here.

The term "accidental personal injury," within the the meaning of the Workmen's Compensation Act, embraces (1) accidental injury arising out of and in the course of employment, (2) such disease or infection as may naturally result therefrom, and (3) the specific occupational diseases enumerated in the Act. Code, 1943 Supp., Art. 101, Sec. 80 (6). It was admitted in the case at bar that the employee's wound arose out of and in the course of his employment. The issue submitted to the jury was whether his death was the result of the injury. It appeared at the trial that the wound was cleansed and bandaged by the shipyard surgeon, and on the following day the employee, in spite of his bandaged foot, returned to his work as rigger. On January 26 he was treated for bronchitis by his physician, Dr. William C. Geyer; and when he went back to the shipyard on January 30 he presented his physician's certificate of illness. About noon, however, he had to quit on account of pain in his leg and an uncomfortable feeling in his head. After that he never worked again. Fever and headaches gripped him. On February 5, when Dr. Geyer was called again, he was suffering severe pain in his left leg, although the wound in his foot had healed. His physician gave him a sedative to alleviate the pain, and took speci-

mens of blood to see whether there was malaria or some other infection, made a Wassermann test, and also had his sputum examined for miliary tuberculosis. But the tests were all negative. The patient was given a sulfa drug for a week, but he did not improve. At times his temperature was between 104 and 105. On February 20 he was taken to the hospital for further examination and diagnosis. After he entered the hospital, a rash appeared on his face and arms. It was then that Dr. Geyer diagnosed the case as typhus fever.

Dr. Warde B. Allan, a specialist in internal medicine, who saw the patient on March 8, testified before the State Industrial Accident Commission that in his opinion typhus fever was the cause of death. He said that, although typhus fever is not a common disease, he had seen three cases in one hospital within six months. He named its symptoms as aches and pains, loss of appetite, gradual weakness, temperature between 104 and 105, rash on body and limbs, and in severe cases delirium. He explained that the organism causing typhus fever has its habitat in fleas and rats, and that the human body may become infected by the bite of a flea or by excreta from infected fleas or rats carried into the body through a break in the skin. He knew of cases where the virus of typhus had infected the body by entering a puncture wound. When his testimony was read to the jury in the Superior Court, the employer objected to his expression of opinion that it was possible that there was a causal connection between the employee's wound and his death. As Dr. Allan had examined the patient shortly before his death, he was familiar with the case from personal observation. He also examined the hospital record and the autopsy report. He was qualified to express his opinion as an expert. It is an established rule that where an injury or disease is such as to require a person skilled in medicine to determine its cause, a medical expert may testify to his opinion thereof based upon his scientific deductions from given facts. Moreover, a medical expert is not barred from expressing an

opinion merely because he is not willing to state it with absolute certainty. His opinion is admissible in evidence as to the cause which produced, or probably produced, or might have produced, a certain physical condition. As we said in *Langenfelder v. Thompson,* 179 Md. 502, 507, 20 A. 2d 491, 136 A. L. R. 960, the opinion of an expert as to the probability, or even the possibility, of the cause of a certain condition may frequently be of aid to the jury, for when the facts tend to show that an accident was the cause of the condition, the assurance of an expert that the causal connection is scientifically possible may be helpful in determining what are the reasonable inferences to be drawn from the facts.

The employer objected to admission in evidence of that part of the hospital record which gave the history of the case, particularly the statement, "Patient cut left foot and developed an infection involving entire leg." In 1927 a committee of experts appointed by the Commonwealth Fund of New York published a Model Act for Proof of Business Transactions. For many years some of the rules of evidence had been so unwieldly that many of the simplest transactions, such as sale and delivery of merchandise, were often the most difficut to prove. Valid claims were often abandoned because of the fact that the withdrawal of necessary witnesses from the activities of business would cause expense out of proportion to the possible gain. It was finally realized that the difficulty would be lessened if records could be introduced in evidence upon proof that they were made in the usual course of business. In 1936 the Commissioners on Uniform State Laws recommended a Uniform Act on Business Records, which sought to improve on the Model Act by adding a requirement that the record must be testified to by some appropriate witness. In 1929 the Maryland Legislature adopted the Model Act and in 1933 sought to strengthen it by authorizing the introduction of photostatic or photographic reproductions of records. The Maryland Act now provides: "Any writing or record, or a photostatic or photographic reproduction thereof,

whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible in evidence in proof of said act, transaction, occurrence or event, if made in the regular course of any business, and if it was the regular course of such business to make such memorandum or record, or photostatic or photographic reproduction thereof at the time of such act, transaction, occurrence or event or within a reasonable time thereafter." Acts of 1929, Chap. 517; Acts of 1933, Chap. 179; Code, 1939, Art. 35, Sec. 68. Under the broad language of this Act, we find no error in the admission in evidence of the hospital record in the court below. The Act applies to every business, profession, occupation and calling of every kind. The Act also provides that all other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight, but not the admissibility thereof. The purpose of the Act is to put an end to narrowness in the use of the familiar rule of evidence that the person whose statement is received as testimony should speak from personal observation or knowledge, and to bring the rule of evidence nearer to the standards in responsible action outside of the courts. 5 *Wigmore on Evidence,* 3d Ed., Sec. 1530a. Therefore, this Court holds that a hospital record containing the history of a patient's case is admissible in evidence, whether or not the statements therein were made by the patient himself. *Beverley Beach Club v. Marron,* 172 Md. 471, 192 A. 278; *Wickman v. Bohle,* 173 Md. 694, 196 A. 326.

The employer excepted to the refusal of the trial judge to instruct the jury to bring in a verdict against the claimant if they found that the death of the employee (1) "was immediately caused by typhoid fever," or (2) "was not immediately caused by typhus fever." Under our trial rules for common law courts, any party may file with the court written prayers that the court instruct the jury on the law as set forth in the prayers. In its

instructions to the jury, which may be given either orally or in writing, or both, the court may in its discretion instruct the jury upon the law of the case either by granting requested instructions or by giving instructions of its own on particular issues or on the case as a whole, or by several or all of these methods, but need not grant any requested instruction if the matter is fairly covered by instructions actually given. Rules of Practice and Procedure, Part 3, Trial Rule 6. As the court below instructed the jury properly on the law in the case, there was no error in its refusal to include the prayers in its instruction to the jury. As stated in *Larkin v. Smith*, 183 Md. 274, 284, 37 A. 2d 340, it was not the intention of the Court of Appeals to prescribe any special form in which the trial judge should instruct the jury. Otherwise, it would be necessary to couch his instructions in such formal terms as to amount to nothing more than the ordinary written prayers. The whole purpose of permitting and encouraging oral instructions to the jury was to permit the judge to discuss the various aspects of the case in ordinary language, and so it is clear that error will not be found in an oral charge merely because of its method of expression. In fact, the use of the words "immediately caused" may have been confusing to the jury.

The basic question on this appeal is whether the evidence was legally sufficient to warrant submission of the issue whether the employee's death was the result of the accidental injury. It is undeniable that mere possibility of causal connection between a workman's accidental injury and his death is not of itself sufficient to make a submissible case. The connection between a workman's injury and his death must be more than a mere guess or conjecture in point of time and circumstance. *M. P. Moller Motor Car Co. v. Unger*, 166 Md. 198, 206, 170 A. 777. The evidence must make the claimant's theory of the cause of death at least reasonably probable, and must justify the inference that the death resulted from the accident rather than from some other cause. *State, to*

*Use of Kalives v. Baltimore, Eye, Ear and Throat Hospital,* 177 Md. 517, 527, 10 A. 2d 612; *Burton v. Holden & Martin Lumber Co.,* 112 Vt. 17, 20 A. 2d 99, 135 A. L. R. 512.

At the hearing before the Commission, Dr. Allan said merely that the causal connection between the employee's wound and his death about seven weeks later was a possibility. But in the Superior Court Dr. Geyer expressed his opinion not only that typhus fever was the cause of death, but also that the virus of typhus probably entered the puncture wound and infected the body in that manner. He rejected the theory of typhoid fever, because the rash on the patient was quite different from typhoid rash. As the symptoms of typhus fever appeared in this case about ten days after the wound was sustained, he asserted that he was fortified in his diagnosis by the statement of Sir William Osler in one of his medical works that the incubation period in typhus cases is between 5 and 18 days, and the average period 12 days. It is clear that Dr. Geyer's testimony was more than a mere guess or expression of possibility. Of course, no one ever sees a germ go from the source of infection into its victim's body. Germs cannot be traced in their individual wanderings. Sources of infection are based upon observed conditions. After considering all the evidence in this case, we are of the opinion that the jury could accept the claimant's theory of causal connection without indulging in pure guess or speculation.

Dr. Geyer made two agglutination tests for typhus, and both were negative, but he asserted that such tests are not always accurate, and he was positive that his diagnosis was correct. The director of the hospital laboratory testified that a microscopic test of the patient's liver and spleen indicated an atypical case of typhoid fever, and not typhus fever, though he admitted that there is very little difference between the two diseases in their effect upon the liver and spleen. In any event, when any case is tried before a jury on appeal from a decision of the State Industrial Accident Commission,

it is for the jury to determine the question of fact presented, and the judge has no right to control the exercise of the jury's function to weigh the credibility of the evidence. The testimony of a claimant under the Workmen's Compensation Act, although contradicted in many of its material facts, must be accepted by the trial judge as true in determining whether he is entitled to submission of an issue to the jury. *Mayor and City Council of Baltimore v. Schwind*, 175 Md. 60, 199 A. 853; *Spencer v. Chesapeake Paperboard Co.*, 186 Md. 552, 47 A. 2d 385; *Petrelli v. Kimball Tyler Co.*, 186 Md. 604, 48 A. 2d 169. Moreover, it is within the province of the jury to believe or disbelieve any witness and make their decision accordingly. *Monumental Printing Co. v. Edell*, 163 Md. 551, 164 A. 171. If the jury in the court below believed the testimony of Dr. Geyer, the employee's physician, which they had their right to do, the evidence was sufficient upon which to base the verdict.

Finally, the employer argued that, under the Workmen's Compensation Act, Code, 1943 Supp., Art. 101, Sec. 80 (6), an accidental personal injury includes any such disease or infection "as may naturally result" from an accidental injury, but that the claimant's theory of the cause of death was the most unnatural and improbable of all the theories possible under the evidence. The employer relied strongly on the testimony of Dr. Charles O'Donovan that nearly all persons who are infected with typhus are infected as the result of insect bites, because the typhus organism is parasitical, and cannot live long outside a living host. However, the statute does not mean that the disease or infection must result according to the usual course of things in the sense of something contemplated or expected. The test of compensability in every workmen's compensation case is whether the injury or disease arose out of and in the course of employment. It is immaterial whether or not the injury came from a normal occurrence. It is also immaterial whether or not a workman's death is the usual or expected result of an injury in order that his injury may

be considered as the proximate cause of his death. It is sufficient if his death could have been caused by the accident, and no other efficient cause has intervened between the injury and the death. *Baber v. John C. Knipp & Sons,* 164 Md. 55, 163 A. 862. Likewise, in determining whether a disease is one such "as may naturally result" from an injury, it is immaterial whether or not the disease was usual or expected as long as there was a direct causal connection between the injury and the disease so that the disease is directly attributable to the injury. *Bramble v. Shields,* 146 Md. 494, 504, 506, 127 A. 44.

As the evidence in this case justified the trial court in submitting the issue whether the employee's death resulted from the injury which arose out of and in the course of his employment, the judgment in favor of the claimant will be affirmed.

*Judgment affirmed, with costs.*