951 A.2d 118

**Toot YOUNGBLUD**

v.

**FALLSTON SUPPLY CO., INC., et al.**

**No. 1625, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

June 30, 2008.

John A. Schruefer, Jr. (Seigel, Tully and Furrer on the brief), Baltimore, for appellant.

Joan P. Adelman (Tammy R. Johnson on the brief), Towson, for appellee.

Argued before DEBORAH S. EYLER, WOODWARD,* ADKINS, SALLY D., JJ.

DEBORAH S. EYLER, J.

Toot Youngblud, the appellant, was injured in a fall at work. He made a claim for workers' compensation benefits against his employer, Fallston Supply Co., Inc. ("Fallston Supply"), the appellee. (Fallston Supply's workers' compensation insurer also is an appellee.) The Workers' Compensation Commission ("Commission") found that Youngblud had sustained an accidental injury in the course of and arising out of his employment, and awarded him compensation benefits. Fallston Supply filed an action for judicial review of that decision in the Circuit Court for Harford County. Youngblud filed a motion for summary judgment, which Fallston Supply opposed and which was denied by the court on the first day of trial.

The case was tried to the court as an "essentially *de novo*" workers' compensation appeal. *See Baltimore County v. Kelly*, 391 Md. 64, 74–75, 891 A.2d 1103 (2006); *Richardson v. Home Mut. Life Ins. Co.*, 235 Md. 252, 255, 201 A.2d 340 (1964). The trial lasted two days, after which the court held the matter *sub curia*. Soon thereafter, the court issued a 10 page written opinion making findings of fact, discussing the law, and deciding, ultimately, that, although Youngblud's inju-

---

* Sally D. Adkins, now serving on the Court of Appeals, participated in the hearing and conference of this case while an active member of this Court; she participated in the adoption of this opinion as a specially assigned member of this Court.

ries were sustained *in the course of* his employment, they did not *arise out of* his employment. Accordingly, the circuit court reversed the Commission's award and entered judgment in favor of Fallston.

In this appeal, Youngblud poses three questions, which we quote:

"I.  DID THE CIRCUIT COURT ERR IN NOT FINDING THAT THE ANSWER TO INTERROGATORY # 5 OF THE EMPLOYER AND INSURER WAS NOT AN ADMISSION OF COMPENSABILITY OF THE CLAIMANT'S INJURY?

II.  DID THE CIRCUIT COURT ERR IN NOT GRANTING THE CLAIMANT'S (APPELLANT) MOTION FOR SUMMARY JUDGMENT BASED ON [AN] ANSWER TO INTERROGATORY # 5 OF THE EMPLOYER AND INSURER?

III.  DID THE CIRCUIT COURT ERR IN FINDING THAT THE CLAIMANT (APPELLANT) DID NOT SUSTAIN AN ACCIDENTAL INJURY ARISING OUT OF HIS EMPLOYMENT WITH THE EMPLOYER (APPELLEES) ON SEPTEMBER 23, 2005?"

For the reasons that follow, we find no error, and therefore shall affirm the circuit court's judgment.

## FACTS AND PROCEEDINGS

The following factual summary is based upon the trial judge's written findings, all of which are supported by competent and material evidence in the circuit court record.

Youngblud was hired by Fallston Supply in 2003, as a Computer Aided Design ("CAD") drafter/junior project manager. Fallston Supply's business is located in a two-story renovated residential house in Fallston. At the relevant time, Youngblud's office was on the second floor.[1] He shared his office with Paul Madigan, another employee.

---

1.  When Youngblud first started working at this business location, the second floor still was being renovated, and therefore his office was on

As a teenager, Youngblud was diagnosed with Type I (insulin-dependent) diabetes. Since October 2003, he has been treated by Philip A. Levin, an endocrinologist. He also is monitored by Dr. Levin's diabetes medical team. Youngblud's treatment includes medication, nutritional restrictions, and exercise. He checks his blood sugar level several times during the day to determine whether it is in the normal range, or whether it is too low (*i.e.,* whether he is hypoglycemic). If his blood sugar is too low, he will elevate it by eating or drinking something or taking a glucose pill.

Before the accident date in this case—September 23, 2005—Youngblud had experienced some hypoglycemic episodes, brought on by his diabetes. His symptoms during an episode would vary. Sometimes he would become shaky, "lightheaded," confused, and hungry. When he felt a hypoglycemic episode coming on, he would test his blood sugar and, if necessary, get something to drink or eat or take a glucose tablet. Dr. Levin had noted that Youngblud sometimes experienced hypoglycemia in the late mornings.

Youngblud's daily work routine, as relevant to this case, was to pack his lunch and arrive at the office at 8:00 a.m. He would put his lunch in the refrigerator in the kitchen, on the first floor, and would go to his office on the second floor. Usually, he would check his blood sugar sometime during the morning. Around 10:00 a.m., he would go downstairs to the kitchen and eat or drink something sweet. He then would return to his office and continue working until around noon, when he would go downstairs and eat his lunch.

The house in which Fallston Supply's business is located has a typical residential staircase. There is a landing at the top of the stairs on the second floor, with a ceiling light and a window. Ten steps lead straight down, to a small landing and, facing straight ahead, a wall. From the small landing, there is one step, to the left, to the first floor. As one walks down the

---

the first floor. After the second floor renovations were completed, his office was moved upstairs.

staircase, a wall is to the right and a wooden bannister is to the left, ending at the bottom of the small landing. The staircase is the only means of access between the first and second floors of the house. Because Youngblud's office was on the second floor, he had to walk up and down the staircase during the workday.

On the day of the accident, Youngblud arrived at work at the usual time. He checked his blood sugar and it was 80, which is in the normal range. At about 10:00 a.m., he went downstairs to the kitchen and ate some grapes. He returned to his office on the second floor until shortly before noon. While in his office, he started to feel lightheaded and decided to go downstairs and outside to get some air before eating lunch. He got up, walked to the top of the staircase, and fell down, landing on the small landing, with his head wedged against the wall. Youngblud has almost no memory of what happened when he fell, other than of waking up on the small landing.

Madigan realized that Youngblud had fallen, rushed to his side, and yelled out that Youngblud was unconscious and that someone needed to call 911. Fallston Supply's president, Renee Connelly, heard a thump, followed by "boom, boom, boom, boom," and found Youngblud at the bottom of the stairs, on the small landing. Youngblud regained consciousness while Mrs. Connelly and others were waiting for the emergency personnel to arrive. They did not want to move him for fear of compounding his injuries. Youngblud told Mrs. Connelly that he had felt lightheaded.

The EMS personnel arrived on the scene approximately 6 minutes after the 911 call came in. They checked Youngblud's blood sugar and found it to be 58, which is low. They gave him glucose and dextrose to elevate his blood sugar. Rebecca Gibbons, one of the medical personnel who responded, spoke to Youngblud. He told her that he had fallen down the stairs when he was going to get something to eat.

George Connelly, the company's vice president (and Mrs. Connelly's husband) and Madigan each had interactions with

Youngblud soon after the fall, when he woke up. Youngblud told Mr. Connelly that he was in his office when he started not to feel well, and decided to go outside. (He also said he had "given himself a shot.") At the top of the stairs, he felt lightheaded. That is the last thing he could remember. Youngblud also told Madigan that he had felt lightheaded and had decided to go downstairs to get something to eat.

Youngblud was transported to the University of Maryland Shock Trauma Center. His medical records state as a history that he developed lightheadedness and fell down ten steps. They further state, in diagnosis, that Youngblud's lightheadedness and dizziness were secondary to a hypoglycemic episode. The history reported by the medical personnel states that the primary reason for Youngblud's injury was "hypoglycemia (low blood sugar)."

At trial, there was "no evidence of any defects or abnormalities in the carpeting on the stairs or any defects, abnormalities, or unusual condition on the stairs themselves," at the time of the fall. Nor was there any evidence of "obstructions, poor lighting or any other unusual condition applicable to either [Youngblud's] office or the stairs."

As we have explained, Youngblud filed a request for benefits with the Commission, which Fallston Supply opposed. The Commission held a hearing on January 31, 2006, on the following issues: "1. Did the employee sustain an accidental injury arising out of and in the course of employment? 2. Is the disability of the employee the result of an accidental personal injury arising out of and in the course of employment? [and] 3. Temporary total disability benefits." In pertinent part, the Commissioner found:

[T]he claimant sustained an accidental injury arising out of and in the course of employment on 9/23/05, that the disability of the claimant is the result of the aforesaid accidental injury, and that as a result thereof the claimant was temporarily totally disabled from 9/24/05 to present and continuing. Further finds that defense of idiopathic condition is denied (stair case condition contributed to the fall).

In his memorandum opinion reversing the Commission's award, the trial judge found, based on the facts we have recited above, that Youngblud fell down the stairs because he suffered a hypoglycemic episode. Thus, his injuries "were unquestionably precipitated by his personal idiopathy—diabetes." In that circumstance, resulting injuries only are compensable if the "idiopathic event was aggravated or triggered by some facet of the employment" or "some facet of the employment contributed to the hazard created by the idiopathic event." However, "[e]mployees using the stairs is not unusual. There is nothing unique about it." The court concluded that, because the diabetes-induced fall was not aggravated or triggered by some facet of Youngblud's employment, and because no facet of the employment contributed to a hazard created by the diabetes-induced fall, Youngblud's injuries did not *arise out of* his employment.

We shall include additional facts as necessary to our discussion of the issues.

## DISCUSSION

### I & II

These issues are interrelated, and so we will address them together.

In the circuit court judicial review action, Youngblud propounded interrogatories to Fallston Supply, including Interrogatory 5, as follows:

> If you contend [that Youngblud] sustained no disability as a result of an accidental injury arising out of and in the course of employment, state all the facts upon which you base this contention.

Fallston answered, "No such contention."

Before trial, Youngblud filed a "Motion for Summary Judgment or, in the Alternative, Motion to Exclude Evidence, Inconsistent with Discovery From Trial." He argued that Fallston Supply's answer to Interrogatory 5 was an admission that "the injury is compensable," which entitled him, as a

matter of law, to an affirmance of the Commission's decision. Fallston Supply opposed the motion. The court took the motion up at the outset of the first day of trial. It implicitly denied the motion, explaining:

Quite frankly, I don't see it that way to be quite honest with you [referring to Youngblud's lawyer]. The issue of whether or not there is any disability is separate and apart from whether or not whatever happened is compensable. You can separate those out as you all know when you're at the Commission and you submit issues there is [accidental injury], causal connection, all of those things. So really the narrow issue here is not so much the nature and extent of disability as it is whether or not it's compensable at all, right?

Counsel for the parties both acknowledged that the court was correct. Youngblud's lawyer then remarked that there was no dispute that Youngblud was acting within the scope of his employment when the accident occurred, and counsel for Fallston Supply replied:

. . . . [W]hat we will contend is that the injury did not arise out of and in the course of [his employment]. It's a two pronged test, one being time and place, which we agree he was at work, and the other being the conditions of the occupation which his was a CAD operator. You understand.

The court responded, "I do," and then said, "it's de novo," and asked counsel to go forward with their opening statements, which they did.

On appeal, Youngblud contends the circuit court erred by "not finding" that Fallston Supply's answer to Interrogatory 5 "was not an admission of compensability" and further erred by not granting summary judgment in his favor based upon that admission. Fallston Supply responds that these issues are not properly before this Court for review, because the court did not rule on Youngblud's motion for summary judgment or to preclude evidence, and therefore there is not a final, appealable judgment to be challenged. Fallston Supply further responds that the contention lacks merit in any event.

█ Fallston Supply's appealability argument is not meritorious. There is a final judgment in this case. It was entered after trial, by order accompanying the court's memorandum opinion. The fact that the court did not expressly deny the motion for summary judgment when it was considered, prior to trial, and the fact that there is no written document entered in the record stating that the motion for summary judgment was denied do not mean that there is no final judgment in this case or that this Court cannot review the question whether the court erred by not granting summary judgment, as requested.

█ The trial judge reasonably would have thought, from the statements of counsel—especially counsel for Youngblud—made with respect to the summary judgment issue that Youngblud was conceding that any concession about "disability" is not equivalent to a concession about "compensability," and therefore the summary judgment request was not meritorious. Even if counsel for Youngblud did not intend to concede on that issue, the trial judge's remarks and the fact that he called the case for trial makes plain that he was denying Youngblud's motion for summary judgment. As noted above, after trial, a final judgment was entered, which was appealable. A party appealing from a final judgment can raise, in that appeal, challenges to interlocutory rulings, including the denial of a motion for summary judgment. *See Maryland State Board of Educ. v. Bradford,* 387 Md. 353, 382–83, 875 A.2d 703 (2005). Therefore, Youngblud's argument that the trial court erred in denying his summary judgment motion is properly before this Court on appeal.

█ We reject Youngblud's contention on its merits, however. The decision to grant or deny a motion for summary judgment is reviewed *de novo. Livesay v. Baltimore County,* 384 Md. 1, 9, 862 A.2d 33 (2004). The circuit court may grant summary judgment if there is no genuine dispute of material fact and, on the undisputed material facts, the moving party is entitled to judgment as a matter of law. *Haas v. Lockheed Martin Corp.,* 396 Md. 469, 479, 914 A.2d 735 (2007).

Youngblud's Interrogatory 5 is inartful in its use of double negatives, clauses that are not clear in their significance, and undefined terms. Depending upon how the Interrogatory is read, Fallston Supply's answer could mean: 1) it was not contending that Youngblud did not sustain a disability; 2) it was not contending that Youngblud did not sustain a disability due to an accidental injury; or 3) it was neither contending that Youngblud did not a) sustain a disability; b) sustain that disability as a result of an accidental injury; c) sustain that disability arising out of his employment; or d) sustain that disability in the course of his employment. On appeal, Youngblud argues that the Interrogatory had to have been read to require Fallston Supply to answer that it was, or was not, contending that he did not sustain a disability, did not sustain a disability as a result of an accidental injury, did not sustain a disability arising out of his employment, and did not sustain a disability in the course of his employment and, therefore, its answer, "No such contention," was an admission that Youngblud's injuries in the accident arose out of his employment.

It is clear from the exchange about the summary judgment motion between the court and counsel that the trial judge was reading Interrogatory 5 as a question about disability, and not about anything else, including compensability. That is a reasonable way to read this very confusing Interrogatory. And, when the trial court made its reading of the Interrogatory known, counsel for Youngblud did not make an argument to the contrary. We do not fault the trial judge for reading Interrogatory 5 narrowly, as an inquiry into contentions about disability, and not broadly, as an inquiry into contentions about additional issues, such as whether any disability suffered was the result of an accidental injury and/or arose out of and in the course of employment. If Youngblud had wanted to elicit a specific, pointed, concession by Fallston Supply that his injuries arose out of his employment, he should have posed a specific, pointed Interrogatory, not an inartful and ambiguous one.

The court did not err in reading Interrogatory 5 to be a question about disability only, and not about anything else,

including whether a disability arose out of employment, and therefore determining, based on that reading, that Fallston Supply did not concede the issue of whether Youngblud's injuries arose out of his employment. As that was the only basis for Youngblud's summary judgment motion, the decision to deny it was legally correct.

### III.

Youngblud next contends that the circuit court erred in finding that he did not sustain an accidental injury arising out of his employment with Fallston Supply. His contention is two-pronged.

### (A)

First, citing *General Motors v. Bark,* 79 Md.App. 68, 555 A.2d 542 (1989), Youngblud points out that, in an essentially *de novo* action for judicial review of a workers' compensation decision, the trial court is not to be concerned with whether the Commission properly construed the facts. That is a correct statement of law. Youngblud argues from that statement, however, that, in this case, the trial court "was only considering whether or not the Commission's finding of fact [about a defect in the staircase] was correct," and therefore was erroneous as a matter of law. We disagree.

The case at bar was tried as an essentially *de novo* appeal of the Commission's decision that Youngblud's injuries, sustained in the fall, arose out of his employment. More specifically, the Commission had "denied" Fallston Supply's assertion that the injuries did not arise out of Youngblud's employment because they were the result of an idiopathic condition (a hypoglycemic attack caused by diabetes).

As his written opinion makes plain, the trial judge properly recognized that in an essentially *de novo* action for judicial review of a Commission decision, the court (or a jury, which was not selected here) is the fact-finder, even though the Commission's decision comes into evidence and is presumed to be *prima facie* correct. Md.Code (1957, 1999 Repl.Vol., 2007

Cum.Supp.), section 9–745(d) and (e) of the Labor and Employment Article ("LE"); *Kelly, supra,* 391 Md. at 74, 891 A.2d 1103. The "Findings of Fact" in the trial judge's opinion plainly are findings that the judge has made, based on the evidence before him. In his written analysis, on the issue of a defect, if at all, in the staircase, the court, contrasting the evidence in this case with that in *CAM Construction Co., Inc. v. Beccio,* 92 Md.App. 452, 608 A.2d 1264 (1992), *aff'd,* 329 Md. 600, 620 A.2d 939 (1993), stated:

> [I]n the case *sub judice,* the Employer has convinced me that there was absolutely nothing [about the staircase] that contributed in any way to [Youngblud's] fall. I credit the testimony of Mrs. Connelly, that the window shade at the top of the staircase was open revealing light and the light fixture above the stairs was on. In *Beccio,* the court made the observation: "unencumbered by his tools in a well-lit hallway, absent debris on floor, Beccio may have been able to steady himself or break his fall in the event that the Dantrium [a medication he was taking] did in fact make him dizzy." Unlike *Beccio,* in this case there is no evidence of any defective or other unique or unusual condition which contributed in any way to [Youngblud's] fall. There was no equipment or obstruction in the hallway or stairs.

Likewise, in ruling from the bench, prior to issuing his written ruling, the trial judge commented (as Youngblud points out):

> THE COURT: [Counsel for Youngblud], I find based on the evidence as presented to me I haven't heard a single shred of evidence there was any defect with the stairs of the carpet. None.
>
> [COUNSEL FOR YOUNGBLUD]: That's what I was going to say. He said that the carpet, you snag your foot on that carpet. I have asked him specifically about that.
>
> THE COURT: But there is no evidence that he snagged his foot on that carpet on this day.

From the trial judge's oral comments and his written opinion, it is clear that he was making his own factual findings

about the events of the day of the accident, including whether any defect existed in the staircase that contributed to the fall (also including Youngblud's ability to stop the fall), based upon the evidence. There is nothing to suggest that the judge was focusing not on making *de novo* factual findings, but on reviewing the correctness or not of the Commission's factual findings. To be sure, the trial judge's factual findings on this point differed from those of the Commission. The trial court was not, however, applying an improper standard of review or otherwise straying from the essentially *de novo* process for deciding an appeal from the Commission.

### (B)

In the second part of his contention, Youngblud argues that, under the controlling case law about idiopathic conditions of employees, he "was, without doubt, especially given his known condition, placed in a position of danger by having to use steps for ingress and egress. These steps were clearly incident to his employment. Therefore, his injury is compensable within the meaning of the Workers' Compensation statute." We disagree with this assertion as well.

As mentioned already, the primary issue in this judicial review action was whether the injuries that Youngblud sustained in his fall arose out of his employment, a necessary prerequisite for benefits under LE section 9–101(b). (The parties agreed that the fall and injuries were "in the course of" Youngblud's employment, *i.e.*, that they happened while he was at work.)

"An injury is said to 'arise out of' employment when it results from some obligation, condition or incident of employment." *Beccio, supra,* 92 Md.App. at 460, 608 A.2d 1264 (quoting *King Waterproofing Co. v. Slovsky,* 71 Md.App. 247, 252, 524 A.2d 1245 (1987) (citing *Scherr v. Miller,* 229 Md. 538, 543, 184 A.2d 916 (1962)). "The term 'idiopathic condition' refers to certain risks or conditions which are 'personal to the claimant' and do not themselves arise out of employment, unless the employment contributes to the risk or aggravates

the injury." *Beccio, supra,* 92 Md.App. at 455 n. 2, 608 A.2d 1264 (quoting A. Larson, *The Law of Workmen's Compensation* § 12.00 (1990)).

In *Watson v. Grimm,* 200 Md. 461, 90 A.2d 180 (1952), an employee sustained fatal injuries when he fell off the running board of a garbage truck as it was being driven by his employer, a garbage collector. The employee fell after becoming dizzy as he was standing on the running board. The employee's son brought a workers' compensation claim for the death of his father. The employer contested the claim, on the ground (among others) that the injury and death did not "arise out of" the worker's employment. The employer argued "that [the employee's] dizzy spell was caused by an idiopathic condition that had no connection with his employment." *Id.* at 465, 90 A.2d 180.

The Commission awarded compensation upon a finding that the death not only was in the course of employment but also "arose out of" the employment. The circuit court reversed on judicial review. The Court of Appeals in turn reversed, ruling that the Commission properly had found, among other things, that the death arose out of the employment. The Court observed that, on the evidence presented, including hospital records of the decedent after the fall and before death, in which he stated that he " 'got dizzy and things got black and he fell,' " whatever the condition that made him faint, "there was a causal connection between the injury and the work of garbage collection, as his employer allowed him to ride on the truck, and especially as there was some hazard in riding on the running board[,]" which the employer customarily allowed the employees to do. 200 Md. at 465, 90 A.2d 180. The Court explained:

> An employee's fall need not be caused by an accident in order that his death resulting from the fall may be compensable under the [Act], *but it is sufficient if the death is brought about by a hazard of the employment and would not have ensued if it had not been for the employment.* It is considered that the fall and the resulting injury constitute the accident within the contemplation of the Act. *Where an*

*employee's injury resulting from a fall is contributed to by some factor peculiar to the employment, it arises out of the employment within the meaning of the Act, although the fall has its origin solely in some idiopathy of the employee.*

*Id.* at 465–66, 90 A.2d 180 (emphasis added).

Youngblud argues that he was "placed in a position of danger by having to use the steps for ingress and egress. These steps were clearly incident to his employment. Therefore, his injury is compensable within the meaning of the Workers' Compensation statute." In so arguing, he adds, "the steps clearly made [his] fall more severe."

In response, Fallston Supply argues that *CAM Construction Company, Inc. v. Beccio, supra,* makes plain that the trial court in the case at bar correctly concluded that Youngblud's injuries did not arise out of his employment. In *Beccio,* a construction worker was walking down a dark corridor in a building under construction when he tripped and fell over debris. Because he was carrying tools in both arms, he could not reach forward to break the fall, as he otherwise would have been able to do. The worker also was on a prescription muscle relaxant, for a neurological "toe-walking" condition, and had taken some of that medication soon before he fell. In an essentially *de novo* action for judicial review, tried before a jury, the court ruled that the employer could not introduce any evidence that the worker had been prescribed the medication or had taken it prior to the fall. The jury returned a verdict for the employee.

On appeal, this Court reversed, holding that the evidence about the medication should have been admitted. We explained:

Maryland law holds that, where an injury occurs because of a risk or condition personal to an employee (i.e., an idiopathic condition), it does not arise "out of" the employment, and is therefore not compensable under [the Workers' Compensation Act], provided that the employment does not aggravate or contribute to the risk. *See, e.g., Robertson v. North American Refractories Co.,* 169 Md. 187, 181 A. 223 (1935)

(where no evidence of accident, injury not compensable). An injury is compensable, however, if the employment placed the employee in a position which aggravated the effects of a fall due to the idiopathic condition, or if the employment precipitated the effects of the condition by strain and trauma. *Bethlehem Steel Co. v. Jones,* 222 Md. 54, 158 A.2d 621 (1960) (employee's death after 13 foot fall caused or hastened by his pneumonia); *Watson v. Grimm, [supra]* (fall from running board of a moving truck after employee became dizzy); *J. Norman Geipe v. Collett,* 172 Md. 165, 190 A. 836 (1937) (stroke due to shock of barely avoiding an auto accident). Thus, even if the sole *origin* of an employee's injury is idiopathic, the employee may receive workers' compensation as long as "some factor peculiar to the employment" contributed to the injury.

*Id.* (some citations omitted) (emphasis in original). Moreover, [g]eneral discussions of idiopathic causes of on-the-job injuries ... indicate that the central question is not the nature of the idiopathic condition, but whether the employment in any way *increased* the severity of the employee's injury. *See* M. Pressman, *Workmen's Compensation in Maryland* § 2–5, at 89 (1977); Larson, § 12.12 ("The basic rule, on which there is now general agreement, is that the effects of [an idiopathic] fall are compensable if the employment places the employee in a position increasing the dangerous effects of such a fall, such as on a height, near machinery or sharp corners, or in a moving vehicle.")

92 Md.App. at 464, 608 A.2d 1264 (emphasis in original).

The trial judge applied the law as stated above in deciding whether Youngblud's injuries, occasioned by his fall, arose out of his employment or, by contrast, were of an idiopathic cause, *i.e.,* due to his diabetes and not brought about by the employment or aggravated or made worse by it. He concluded that the injuries did not arise out of Youngblud's employment because 1) as a matter of fact, Youngblud fell down because he suffered an attack of hypoglycemia; and 2) the fall was not brought about by a hazard of the employment and was not

contributed to by "some factor peculiar to the employment." The judge found, by a preponderance of the evidence, with the burden of persuasion resting with Fallston Supply, that "in no way shape or form did [Fallston Supply] or anything incident to [Youngblud's] employment contribute to the fall." Specifically, there was nothing about the condition of the staircase or the lighting or the carpeting" that contributed to the fall; and "[e]mployees having to use stairs is not unusual. There is nothing unique about it."

The trial judge's first-level factual findings, as we already have said, are supported by competent and material evidence in the record. None of them are clearly erroneous. The court's second-level factual findings—that there was nothing in the workplace that contributed to the fall (such as there was in *Watson* and *Beccio*) and that using the stairs at work is not a factor peculiar to the employment—also are supported by record evidence and are not legally in error. Youngblud's job as a CAD drafter did not involve a special risk, such as the risk of riding on the running board of a garbage truck, that brought about the fall or made the injuries he sustained in the fall more severe than they otherwise would have been. Simple tasks of daily life, such as walking through the workplace or taking stairs in the workplace to get from one place to another, are not peculiarities of employment.

To be sure, it is possible that Youngblud's injuries from fainting and falling due to a hypoglycemic episode may not have been as severe if he had fallen in his office, in the kitchen, or in some area of the workplace other than the staircase. That does not make using the staircase an incident or hazard of his employment. *Watson* and *Beccio* are readily distinguishable, involving, as they did, peculiarities of the occupations themselves (riding on a running board of a moving vehicle; walking through construction debris at a job site). Nothing about Youngblud's job as a CAD drafter created a hazard that contributed to his fall or aggravated his injuries.[2]

---

**2.** *Bethlehem Steel Co. v. Jones,* 222 Md. 54, 158 A.2d 621 (1960), and *J. Norman Geipe, Inc. v. Collett,* 172 Md. 165, 190 A. 836 (1937), both

Accordingly, we shall affirm the trial court's ruling that Youngblud's injuries were idiopathic and did not arise out of his employment.[3]

**JUDGMENT AFFIRMED.   COSTS TO BE PAID BY THE APPELLANT.**

---

cited by this Court in *Beccio,* also are easily distinguishable.   In *Jones,* the employee died after falling 13 feet from a perch on which he had to shovel limestone for unloading to a bin, in which he was found lying face down.   The Court held that, even if evidence was credited that the employee had been weakened by a recent bout of pneumonia, and that "personal idiopathy . . . may have contributed to the fall," the accident still arose out of the employment.   *Id.*   Clearly, having to shovel limestone from a precarious position 13 feet in the air was a hazard of the worker's employment.

In *Collett,* the employee, a truck driver for a freight hauling company, suffered partial paralysis when he could not avoid striking a man who climbed down from the tailgate of a truck immediately in front of the employee's truck.   The employee's hands went limp and he became unable to move.   There was evidence that he had high blood pressure and "hardening of the arteries," which had been asymptomatic, but may have caused the cerebral hemorrhage that produced the paralysis. The Court held that, assuming that to be the case, the employment itself was "extra hazardous" and, therefore, the paralysis arose out of the employment.   172 Md. at 172, 190 A. 836.

**3.**   We note that there is no evidence in the record that Youngblud asked at any time not to be assigned to a second floor office.